19-2216 Phytelligence v. Washington State University. Mr. Flynn, we're ready whenever you are. Thank you, good morning, and may it please the court. The district court made two fundamental errors that require reversal. Number one, the court found that Phytelligence's option agreement was an unenforceable agreement to agree because it, quote, required a future contract without detailing the terms of such a contract, close quote. That ruling is irreconcilable with Washington State law, which recognizes that agreements with open terms are enforceable agreements. What distinguishes agreements with open terms is that there's a method for determining the open terms. Here, there was not only an agreed-upon method for determining the open terms. That method was, in fact, followed by WSU to develop a uniform set of licensing terms for all industry participants. There was nothing left for negotiation. No further meeting of the minds was required. Phytelligence's option entitled it to those uniform licensing terms. Number two, the second fundamental error. The court ruled that there were no triable issues for the jury because it refused to consider any of the extrinsic... Counsel, this is Judge Reyna. I'd like to point your attention to section four of the propagation agreement. This is the option clause, and it says there, halfway through the provision, it says propagator will need to sign a separate contract with WSURF. What are the terms of that separate contract? The terms of that separate contract are the uniform license terms Washington State developed and approved in connection with making the Apple available for licensing. That's exactly what the Washington State officials told Phytelligence during the negotiations of the contract. That's exactly what Washington State's existing custom and practice was at the time the contract was executed. That's exactly what Washington State did in the course of performing the contract. It's also, per Washington State University's 30b6 witness, it was... You seem to be describing perhaps aspirations of the party at some point in the future, but I don't see those as contractual terms. Show me where there's been an agreement on the contractual terms on this separate contract with USURF. In the joint appendix at 610 through 659 is the declaration of Mr. Learley who negotiated the agreement on behalf of Phytelligence. At page 612, Mr. Learley describes what Anton Fapp, WSU's senior most official responsible for Mr. Learley made clear that Phytelligence would not enter the propagation agreement without assurance that it would be entitled to a license. Those statements are promises under Washington State law and under the restatement of contracts. Those promises... Mr. Flynn, this is Judge Proust. What's unclear to me about how this case went down is this agreement was signed like in 2012, right? And in 2013, WSU says we want to go forward with commercialization. So they send out an announcement of opportunities and Phytelligence gets it and everybody else gets it. There's nothing wrong with what they did. And others responded and Phytelligence didn't. So they proceeded as it seems to me they had every right to do to proceed and get this contract and get everything going. And then years later Phytelligence comes in and says no no no. They want them to undo what they had done five years later. I mean it was never clear to WSU that Phytelligence would ever come back. I'm sure your position is that you were not required to come back. So how does it make sense in the world of contracts that four years pass, WSU is proceeding as I think you would agree it has a right to do, and now it has to undo everything it's done because Phytelligence is coming in four years later? Your Honor, respectfully, I don't think that's quite what the factual record shows. And because this is a motion for summary judgment, these factual details are critical. When WSU issues its announcement of opportunity, the announcement of opportunity is seeking a manager of the commercialization process. And in that announcement, in the written announcement at APPX Well let me just ask you about that. We can review the record, but isn't it true that the announcement comes out in 2013, they proceed, and that Phytelligence doesn't come in until four years later in 2017? No, that's not true. When did you first try to exercise your option that you allege is in the contract? We began to try to exercise the option in 2014, and we do it continuously up until the point we file suit. When we first try to exercise the option, we are told by WSU that our technology, growing trees in tissue culture, is unproven and we'll have to go through four to five years of field trials. Now that's at odds with the contract which hired us to propagate trees in tissue culture. It's also at odds with WSU's contractual arrangement with the people it favors, PVM and NNII. Both of those entities at all times have been permitted to grow trees in tissue culture. So it's a Phytelligence only position that's obviously inappropriate. And they maintain that position from about 2014 until 2017 where their position changes slightly. But if I may, may I return to your first question? The announcement of opportunity expressly contemplates that whoever responds and wins, that entity is going to have to offer license agreements to people WSU has already committed to offer the If we fast forward in the record, in 2017 when the winner of that announcement of opportunity, PVM, is communicating with Phytelligence, PVM writes and says we have no knowledge of your contractual rights. And the WSU vice president of commercialization, Sita Pappu, who's also their 30b6 witness, knows that that statement, that disavowal of knowledge, is a lie. Well let me go back to what Judge Rayner was asking about, which is why is this sentence in the agreement, which is that you'll need to sign a separate contract to exercise this option? What meaning under your construction of this contract does that phrase have? It has to have some meaning, right? No, it absolutely has to have some meaning, and the meaning was explained to Phytelligence and discussed in the negotiations of the contract, and all of which were confirmed by WSU's 30b6 witness. What that language means is that if WSU made this Apple available, and at the time if it made any cultivar available, it engaged in a process in which it developed uniform license terms that it would make available to all the participants in its licensing program. It does not negotiate individual licenses on a bespoke or individual basis with licensees. It developed a uniform standard license, and that license is what's made available to participants. What this language says is in order to exercise the option, not to have the option to exercise it, Phytelligence is required to sign that agreement. Now, it's merely signed. It's not negotiate, discuss, nothing's left for further negotiation because the party... Yeah, the question is, well, you say that agreement, and... Template the form license developed and approved. Well, they agree all the contract says about it, all the propagation clause in Section 4 says it will sign a separate contract. It doesn't have any specificity or details as to what needs to be in that separate contract, correct? And that is correct. The text is correct. In Washington State, however, the construction of any written agreement, even under the most stringent circumstances, a fully integrated agreement that's deemed unambiguous, even there under Washington State law, extrinsic evidence is always admissible to determine what the parties meant by the terms they used. That's the Berg case, it was affirmed in the Hearst case, and many other cases in Washington State. In this circumstance, that extrinsic evidence makes clear that the parties understood that separate contract would be the standard and uniform license developed by WSU and made available to all of the industry participants. And what's critical to remember is that's not simply what Washington State told Fitelligence during the negotiations, although it very clearly is. That statement has also been confirmed, it's consistent with Washington State's existing custom and truth. It is, in fact, how Washington State did business with respect to its licensing programs. Secondly, it is also precisely what Washington State did going forward after the execution here. And this point in the factual record references the prior question. After the announcement of opportunity, after the responses to the opportunity came in, there's a Washington State University document that talks about its commercialization plan. It says... Why was that document then not referenced on the face of the contract? You're citing a lot of extrinsic evidence, but it seems to me you can't do that unless the terms of the contract are ambiguous. And in here, they're not. You seem to not see the difference between the case and PD systems and what we have here. Respectfully, Your Honor, what the Berg case holds, which is confirmed over and over again, including in the Hearst case, is that in Washington State, extrinsic evidence is admissible even if the language of the written contract is deemed unambiguous. It's always admissible. It must be considered. Once it must be considered, and that's if it relates at all to what the parties understood the terms to mean, then it creates a tribal issue for the jury. It is not true that in Washington State, an unambiguous written contract is construed without extrinsic evidence. The opposite is true. Extrinsic evidence must be considered. A gatekeeping role. Go ahead, Judge Stilts. Well, but the judge still has a gatekeeping role, right? No, Your Honor. That is, if he presented a material issue for the jury as to the credibility or choice between usable inferences regarding their evidence, right? That's a gatekeeping role by the judge, right? That gatekeeping role on a summary judgment is cut in our favor. The evidence, the extrinsic evidence, which is all four things, the negotiations, the custom and practice, preceding execution, the course of performance after execution, and the admissions of WSU after execution, all of those must be accepted as true and construed in the light most favorable to FITELIGENT. In Scott Galvanizing versus Northwest EnviroServices, the Washington Supreme Court held, under Berg, interpretation of contract provisions is a question of law only when the interpretation does not depend on the use of extrinsic evidence or only one reasonable inference can be drawn from the extrinsic evidence. No gatekeeping role under Washington state law applies. It's a uniform mandatory you must consider. It's called the context rule and it's very clear. What about the statements from Washington State University? This is a JA-247. It says that we have no idea how W-838 will be licensed at this time. So that kind of, to me, goes to respond to historical licensing aspects. It goes on and says it could take any form. Under an open license released through a nursery group, it says that decision has not yet been made, so there can be no guarantees made to anyone at this point. How can that statement support an open terms contract? Because the factual record makes clear that when that statement was made... You can finish answering the question. Thank you. When that statement was made, Vitaligent responded by saying we won't sign the agreement under those circumstances. That statement is inconsistent with and contrary to the text of the agreement. We won't enter. They then engaged in discussions with that person's boss, Anton Fatlin, the head of WSURF, who explained to Vitaligent that if WSU decided to commercialize the Apple, it would develop uniform terms made available to all participants. And at that point, Vitaligent would be entitled to a license based on those terms. And everything WSU did since that point, including the announcement of opportunity, was consistent with those statements. Vitaligent is entitled to that license per the contract, and it was legal error, reversible error, to refuse to consider the evidence and to find the contract an unenforceable agreement to agree. Can I just ask you a follow-up to that, which is if licensing is so standardized and so well understood, why was there a bid process soliciting proposals for plans to manage commercialization? That process goes to marketing, development, effort on a business level, efforts to maximize profits with respect to the lease and the license. The terms by which licensees sell the Apple are uniform, and they are developed and approved by WSU in advance and made available to all participants on a standard basis. And so WSU's form option, the use of those languages, the option to participate, hereby granted, those are all consistent with that existing custom and practice and were all confirmed by the subsequent course of conduct. As their 30B6 witness admitted repeatedly and drafted a letter instructing their agents to comply. Okay. You're into your rebuttal, so why don't we hear from the other side and we'll reserve the remainder of your time. Thank you. Mr. Dunwoody? Yes, thank you, Your Honor. May it please the court, my name is Stuart Dunwoody, I represent Washington State University. I would like to make three points today. First, that the district court properly excluded Fiteligen's extrinsic evidence. Second, even if that extrinsic evidence had been admitted, it wouldn't have saved the propagation agreement from being an unenforceable agreement to agree. And third, this court... Well, let me ask you about that. Yes. Let me ask, at the second fourth day, propagators hereby granted an option to participate with the provider and or seller. Why would Washington State grant an option that it thought was an unenforceable? Your Honor, I don't have a... I don't have an explanation for that. It is quite true that Washington State University did make clear to Fiteligen's, when liarly asked, what does this agreement do? It gives... It sent back the email that Judge Reyna read from, saying there can be no guarantees. We don't know how this will be commercialized.  But I'm just looking at the language of the contract. The language of section four, which it says, propagator is hereby granted an option to participate with the provider and or seller. Yes, that's correct. And it also goes on to say that they have to sign a separate contract. And so it basically is an agreement to agree. It's a statement that an option agreement will need to be negotiated. So you think it's construed as, yes, they granted the option. That's what they say. But that whatever the option that was granted is not an enforceable option. That is correct, that it's something that the parties would need to negotiate on and reach agreement on. And it's not something that can be enforced. And that it didn't create a guarantee, just as Mr. Lierley was told by Kelly. So with respect to the extrinsic evidence, Mr. Flynn spoke repeatedly about the context rule in the Byrd case. But he is going far beyond the Byrd rule. The Washington Supreme Court clarified that more recently in Hearst v. Seattle Times to say that the context rule is narrow. The rule allows extrinsic evidence only to determine the meaning of specific words and terms used in an agreement. For example, in Byrd, the issue was what did the term gross rentals mean in a lease agreement? And the Byrd court allowed extrinsic evidence to interpret that term. Here, by contrast, Fitelligence doesn't offer extrinsic evidence for that limited purpose. It doesn't offer that extrinsic evidence sheds light on the meaning of some specific word or term in the propagation agreement, such that it shows that the word separate contract means, oh, a licensed agreement having all these different provisions. So the context rule doesn't help them. Now, the other way that reason why the court was correct to exclude extrinsic evidence is because it's inconsistent with the written terms. The written terms of the propagation agreement impose no requirements on WSU at all regarding the provisions of this required separate contract. So WSU has complete freedom to bargain for any provision it wants in the separate contract and to come up with those provisions any way it wants to. The extrinsic evidence that Fitelligence is offering is inconsistent because it would substantially limit that freedom. It would require WSU to follow a specific process to come up with provisions and then offer the provisions that result from that process to Fitelligence. And this inconsistency and conflict is clearly stated in Leierle's declaration. He said that the draft written agreement didn't provide Fitelligence an enforceable right to a license. He recognized that. And he said that the oral assurances he received did give Fitelligence the right to a license. So that's the inconsistency. Leierle said that before signing the propagation agreement, he asked Kelly about the option provision. He said Kelly's response told him that even if WSU decided to commercialize Law 38, the proposed agreement would not provide Fitelligence with an enforceable right to a license. That's Appendix 611, Paragraph 7. Leierle said that response was unacceptable. Fitelligence wasn't willing to invest in Law 38 without a contractual right to a license to sell and distribute WSU Law 38 if the license became available. That's Appendix 612, Paragraph 8. Leierle said he communicated to Kelly and Fatlin that Fitelligence wouldn't enter into an agreement to propagate without assurance that it would be offered a license. And that Kelly and Fatlin assured him that by entering into the propagation agreement, Fitelligence would have the option to acquire a license. And so the conclusion was that Leierle said with the assurance that Fitelligence would have the right to a license to commercialize Law 38 if one became available, Fitelligence entered into the propagation agreement. So he's saying these oral assurances were inconsistent with what the written agreement had offered and what was not acceptable. And that conflict is also confirmed by Fitelligence's reaction to how WSU ultimately commercialized Law 38. WSU commercialized it by giving an exclusive license to PVM and requiring PVM to exclusively sub-license propagation to NNII, whose member nurseries would do the propagation. That is the sort of licensing arrangement that Kelly told Leierle the draft agreement would allow. That is, quote, an exclusive license with a company, group of individuals, co-op, etc., close quote. That's Appendix 631. Now Fitelligence says that these alleged oral assurances Leierle received preclude WSU from proceeding with that commercialization structure, even though Kelly told Leierle the draft written agreement would allow it. So the situation here is just like the one in Emmerich v. Connell. That's the Washington Supreme Court case involving a lease that the court found was partially integrated. The written terms of that lease allowed cancellation on 120 days' notice. The trial court found that there was an oral agreement that the lesser could not cancel until the property was ready to be developed. The Supreme Court held the oral agreement would substantially limit and therefore was inconsistent with the right of cancellation under the written terms of the lease and held the extrinsic evidence inadmissible. And that exact same analysis applies here. The other point I wanted to make is that even if the extrinsic evidence is admitted, it wouldn't save the propagation agreement from being an unenforceable agreement to agree because it doesn't fill in the blanks of that separate contract. And the extrinsic evidence, again, you need to go back to Leierle's statement in his declaration. And he makes two points there. And I'd like to note that Mr. Flynn is incorrect when he says that Kelly says what Anson Fatlin told him. It's not true. He doesn't actually quote any statements by Fatlin. He just says that he got an understanding and he said he received assurances. But he doesn't say what exact words Fatlin supposedly used. So the first part of that extrinsic evidence is Leierle's statement that he had an understanding from Kelly and Fatlin and unspecified that there would be an internal process at WSU to decide how to commercialize and to develop the set of standard terms. But Leierle didn't explain, didn't describe any statements or conduct by Kelly, Fatlin, or others that gave him that understanding. So all he's attesting to is a subjective understanding on his part, and that understanding doesn't show an agreement by WSU. And then another part of the extrinsic evidence is Leierle's statement that Kelly and Fatlin assured him that Phytelligence would have an option to acquire a license on standard terms. But again, Leierle didn't quote any alleged statements by Kelly or Fatlin that provided that assurance. So there's no showing that whatever they said rose to the level of an enforceable promise and not just an unenforceable statement of future intent. The third point that I'd like to make is that Phytelligence's admissions show that there's no breach of the alleged oral assurances to Leierle. So even if this extrinsic evidence were allowed in, the judgment below can be affirmed on the alternate ground of no breach. Phytelligence says in its briefs that WSU performed according to the alleged oral assurances and developed standard terms. It says that page 3 of its opening brief and pages 3, 9, and 26 of its reply. Phytelligence also admits the standard licensing terms are in the record at appendix 504 through 523. Phytelligence doesn't dispute that WSU and PVM offered Phytelligence a license on those standard licensing terms in September 2017. That offer is at appendix 169 through 198. The terms themselves are within that range and they're identical to appendix 504, 523. So there's no factual dispute that WSU complied with the oral assurances that Phytelligence alleges. Now, Phytelligence also doesn't dispute that it rejected those standard terms and presumably it did that because they expressly require that the license fee be an NNII member nursery in good standing. That's appendix 506. But the oral assurances that Lyerly alleges wouldn't prohibit WSU and PVM from making membership in NNII a requirement for a commercial license. And Lyerly didn't say that the alleged oral assurance was that WSU would develop standard license terms that were acceptable not only to WSU but to Phytelligence as well. If he had said that, that assurance itself would be an agreement to agree, an agreement that the parties would agree on terms acceptable to both of them in the future. And Phytelligence's claim that it couldn't have joined NNII is pure speculation because Phytelligence admits it never applied to join NNII. That's appendix 82. And that's even though Phytelligence had been encouraged to contact NNII at least as early as June 2016. That's appendix 158. So if the court does find a fact issue, it can affirm the summary judgment on the ground of no breach. All right. Any other further questions from the panel? No. Thank you. Thank you. Chief Judge Frost, apologies. This is Michael Lichtenberg. Mr. Flynn exceeded his total time by over two minutes. Did you want me to restore any amount of that? Yes. Why don't you give him the full five minutes if he needs it? Okay. Thank you. Thank you. Please proceed, Mr. Flynn. First, even in the Hearst case, which Washington State University contends limited Berg, the court stated in Berg, quote, we adopted the context rule and recognized that intent of the contracting parties cannot be interpreted without examining the context surrounding the instrument's execution. The extrinsic evidence goes to specific provisions of the written agreement. Namely, commitment to hereby grant an option to participate as a provider or seller of WA-38, subject to WSU releasing it and it becoming, quote, available for licensing by WSURF. So what it means to grant in the moment, to hereby grant an option to participate in commercialization if the Apple becomes available for licensing is text the extrinsic evidence goes to prove. The second text, the propagator will need to sign a separate contract to exercise the option. What that separate contract is, that text is subject to proof based on extrinsic evidence and was expressly discussed in the negotiation of the agreement. The argument that Vitaligent's position is inconsistent with the writing because the writing supposedly gives WSU unfettered discretion or complete freedom to enter licensing arrangements, that's simply wrong. It doesn't. When I make a contractual commitment to give another party an option to participate in my licensing program, I have restrained my freedom. I am not free to disregard that language, treat it as if it doesn't exist, later assure everyone it meant nothing, and do something else. That argument is what's inconsistent with the writing. And to go to the email that we've discussed where WSU officials, intermediate officials, suggest the writing means nothing. Number one, again, that position contradicts the writing. And number two, the evidence is clear and must be accepted as true that Vitaligent's responded by saying that can't be true. We are not entering this agreement based on that understanding. And in response at paragraph 12, at appendix 612, it is clear Kelly and Anson assured me that by entering the propagation agreement, Vitaligent's would have the option to acquire a license on the standard terms if and when such a license becomes available, close quote. That's not a subjective, undisclosed statement of intent. That's what was told Vitaligent in the negotiations. And the critical point here is that that's not the end of the story. That representation, per their own 30B6 witness, was true. That did describe how they operated at the time. And it's how they operated subsequently. The 30B6 witness herself drafted a letter  the other licensees were operating under. Now, to get to breach very briefly with the limited time, breach wasn't a subject of their motion. It was not properly in the record. They raised it on the last two pages of their reply brief in support of their summary judgment motion. The idea of breach is antithetical to their argument. You can't say simultaneously, I don't know what this agreement means.  notwithstanding a clear intent to grant you an option, but, on the other hand, we complied with it. If they complied with it, it would, by definition, be certain enough to be enforced, particularly given the principles that require the court to search for an enforceable agreement when the intent to grant an option is manifest. Lastly, the idea that we... The breach... We'll strike that. The idea that they've complied because the offer was conditioned on membership in NII. Membership in NII isn't the issue. At the time, NNII, working in concert with WSU, had imposed a moratorium on any new members. The offer required Vitaligence to apply for and be accepted by NNII at a time when NNII simply wouldn't accept them. So it was a sham. Had it been in the record, had a motion been made, there are myriad tribal issues. Our option was obliterated by that requirement. There was a moratorium in place preventing us from joining. Now, the contract we're entitled to is that contract. It's in the record. It could not be clearer. It's at Appendix 179 to 193. We would be happy to be members of NNII if NNII and WSU would permit it. And WSU knew, as they admitted in deposition, that they were obliged to facilitate our membership, and they simply didn't do it. All right. Your time is up, sir. We thank both parties, and the case is submitted. That concludes our proceedings for this morning. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.